# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER KENYON,

      Plaintiff,

    v.

DR. JULIAN GUTIERREZ, *et al.*,

      Defendants.

No. 4:24-CV-00426

(Chief Judge Brann)

## MEMORANDUM OPINION

### JULY 30, 2024

Plaintiff Christopher Kenyon filed the instant *pro se* civil rights lawsuit alleging inadequate medical care by prison medical providers at SCI Camp Hill as well as several private medical defendants.  His Section 1983[1] claims primarily sound in deliberate indifference to serious medical needs.  He additionally asserts state-law claims of medical malpractice.  Upon screening as required by 28 U.S.C. § 1915A(a), the Court will dismiss in part Kenyon's complaint.

## I.    STANDARDS OF REVIEW

Courts are statutorily obligated to review, "as soon as practicable," *pro se* prisoner complaints targeting governmental entities, officers, or employees.[2]  One

---

[1]    42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

[2]    *See* 28 U.S.C. § 1915A(a).

basis for dismissal at the screening stage is if the complaint "fails to state a claim upon which relief may be granted[.]"[3]  This language closely tracks Federal Rule of Civil Procedure 12(b)(6).  Accordingly, courts apply the same standard to screening a *pro se* prisoner complaint for sufficiency under Section 1915A(b)(1) as they utilize when resolving a motion to dismiss under Rule 12(b)(6).[4]

In deciding a Rule 12(b)(6) motion to dismiss, courts should not inquire "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[5]  The court must accept as true the factual allegations in the complaint and draw all reasonable inferences from them in the light most favorable to the plaintiff.[6]  In addition to the facts alleged on the face of the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents.[7]

---

[3]   *Id.* § 1915A(b)(1).

[4]   *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109-10 & n.11 (3d Cir. 2002); *O'Brien v. U.S. Fed. Gov't*, 763 F. App'x 157, 159 & n.5 (3d Cir. 2019) (per curiam) (nonprecedential); *cf. Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000).

[5]   *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see Nami v. Fauver*, 82 F.3d 63, 66 (3d Cir. 1996).

[6]   *Phillips v. County of Allegheny*, 515 F.3d 224, 229 (3d Cir. 2008).

[7]   *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

When the sufficiency of a complaint is challenged, the court must conduct a three-step inquiry.[8]  At step one, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim."[9]  Second, the court should distinguish well-pleaded factual allegations—which must be taken as true—from mere legal conclusions, which "are not entitled to the assumption of truth" and may be disregarded.[10]  Finally, the court must review the presumed-truthful allegations "and then determine whether they plausibly give rise to an entitlement to relief."[11]  Deciding plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[12]

Because Kenyon proceeds *pro se*, his pleadings are to be liberally construed and his complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]"[13]  This is particularly true when the *pro se* litigant, like Kenyon, is incarcerated.[14]

## II.   DISCUSSION

The gravamen of Kenyon's complaint is alleged deliberate indifference to serious medical needs and medical malpractice by SCI Camp Hill medical

---

[8]   *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal citations and quotation marks omitted) (footnote omitted).

[9]   *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (alterations in original)).

[10]  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

[11]  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

[12]  *Iqbal*, 556 U.S. at 681.

[13]  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citations omitted).

[14]  *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citation omitted).

providers, as well as alleged medical malpractice by a private physician and his employer.  Kenyon also raises a First Amendment claim of retaliation against the acting superintendent of SCI Camp Hill.  In total, he sues twelve defendants: Dr. Julian Gutierrez, Dr. Arif Shaikh,[15] Registered Nurse Supervisor Patricia Comer, Registered Nurse Monica Effi, Registered Nurse Anthony Orusede, Registered Nurse Cecelia Maduka, Registered Nurse Julius Kariuki, Corrections Health Care Administrator Amanda Beck, Acting Superintendent M. Gourley, Dr. Thomas Mazza, UPMC West Shore, and Wellpath, LLC (Wellpath).[16]

Kenyon asserts the following claims: (1) Section 1983 Eighth Amendment deliberate indifference to serious medical needs[17] against Dr. Gutierrez, Dr. Shaikh, RNS Comer, RN Effi, RN Kariuki, RN Maduka, RN Orusede, CHCA Beck, and Wellpath; (2) Section 1983 First Amendment retaliation against Acting

---

[15]   Kenyon spells the first two Defendants' last names as "Guiteriez" and "Shaihk," but counsel for Defendants has indicated that the proper spelling is "Gutierrez" and "Shaikh," respectively. *See* Docs. 16, 17.  The Court will use the correct spelling of these Defendants' last names.

[16]   *See* Doc. 1 at 3-7.  Although Kenyon names "Wellpath Care LLC" and "Wellpath LLC Correct Care Solutions" as two different defendants, they are actually a single business entity known as Wellpath, LLC or just "Wellpath."  *See Wilson v. Pa. Dep't of Corr.*, No. 1:21-CV-2136, 2023 WL 424268, at *3 n.1 (M.D. Pa. Jan. 26, 2023) (Conner, J.) (taking judicial notice that Correct Care Solutions is "now known as Wellpath pursuant to a 2018 corporate merger with Correctional Medical Group" (citations omitted)); *see also Forrest v. Wetzel*, No. 3:17-CV-1777, 2021 WL 1614810, at *2 (M.D. Pa. Apr. 23, 2021) (Wilson, J.).

[17]   Kenyon asserts three variations of this Eighth Amendment claim: Count 1 – "Denial of Medical Care"; Count 2 – "Delayed Medical Care"; and Count 3 – "Inadequate Medical Care."  *See* Doc. 1 ¶¶ 62-75.  Despite being separated into different counts, Kenyon is essentially asserting a single Eighth Amendment claim that sounds in deliberate indifference to serious medical needs.

Superintendent Gourley; and (3) state-law medical malpractice[18] against Dr.

Mazza, UPMC West Shore, Dr. Gutierrez, Dr. Shaikh, RNS Comer, RN Effi, RN

Kariuki, RN Maduka, RN Orusede, CHCA Beck, and Wellpath.[19]

Kenyon's medical history is extensive and complicated.  He alleges that, on

January 27, 2022, he underwent elective small bowel surgery by Dr. Mazza that

included an ileostomy loop formation and a colostomy.[20]  He was discharged on

February 4, 2022, and returned to the SCI Camp Hill infirmary.[21]

In early March 2022, Kenyon began experiencing complications from his

prior surgery.  During the first week of March, he started having bouts of severe

abdominal pain, nausea, vomiting, and elevated vitals.[22]  After experiencing these

symptoms for several days and receiving various forms of ultimately ineffective

treatment by SCI Camp Hill medical staff, he was transported to the emergency

department at UPMC Harrisburg after vomiting "black bile (blood & stool)."[23]

At UPMC Harrisburg, Kenyon alleges that he was diagnosed with a bowel

obstruction causing an intestinal perforation, as well as "severe malnutrition," an

infection, and gastrointestinal bleeding.[24]  He underwent emergency surgery on

---

[18] Once again, Kenyon separates his medical malpractice claims into two counts labeled "Medical Negligence" and "Medical Malpractice," (*see* Doc. 1 ¶¶ 80-85, 90-93), but those are simply two different names for the same state-law tort.

[19] *See* Doc. 1 ¶¶ 62-93.

[20] *Id.* ¶ 1.

[21] *Id.*

[22] *Id.* ¶¶ 4-17.

[23] *Id.* ¶ 17.

[24] *Id.* ¶ 19.

March 7, 2022, which included an abdominal incision, irrigation of his abdominal cavity, and an alteration to his ileostomy where the "loop formation" was modified to "a single ileostomy."[25]

On March 12, 2022, apparently while still in inpatient care at UPMC Harrisburg, Kenyon began experiencing a fever and heavy sweating and then lost consciousness.[26] He was told that he was experiencing "sceptic [sic] bleeding" and required another emergency surgery, this time receiving a blood transfusion and a "PICC line" in his neck.[27] Kenyon claims that his hospitalization was further complicated by another infection in mid-March due to stool from his colostomy bag entering his abdominal wound.[28]

Kenyon was finally discharged from UPMC Harrisburg on March 30, 2022, and sent back to the infirmary at SCI Camp Hill.[29] Unfortunately, in mid-April, he began to experience frequent vomiting again.[30] On the second day of these symptoms, after informing Dr. Gutierrez of his repeated vomiting, Dr. Gutierrez called an ambulance for Kenyon and he was transported to UPMC Harrisburg again.[31] There he was diagnosed with another bowel obstruction and was hospitalized for two more weeks, during which another PICC line was inserted,

---

[25]   *Id.* ¶¶ 19-20.
[26]   *Id.* ¶ 21.
[27]   *Id.* ¶ 22.
[28]   *Id.* ¶ 24.
[29]   *Id.* ¶ 26.
[30]   *Id.* ¶¶ 28-29.
[31]   *Id.* ¶¶ 30-31.

this time into his inner bicep.[32]  He was discharged with the PICC line still in place and returned to the infirmary at SCI Camp Hill.[33]

Kenyon avers that, over the next month while in the prison infirmary, his PICC line was only cleaned one time (May 16, 2022) even though he believes it should have been flushed or cleaned more frequently.[34]  He attributes the alleged shortcoming to "1st shift nurses" Monica Effi and Julius Kariuki.[35]  Kenyon maintains that the PICC line was eventually found to be clogged due to this neglect, and that—after a heparin flush failed to remove the obstruction—he was again sent to UPMC Harrisburg on May 20.[36]  At the UPMC Harrisburg emergency department, an I.V. Technician unclogged the PICC line and Kenyon was sent back to the SCI Camp Hill infirmary.[37]

Shortly after returning to the prison infirmary, Kenyon began experiencing chills, palpitations, and dizziness, which a nurse believed to be symptoms of a blood infection.[38]  On May 23, 2022, he was once again taken by ambulance to UPMC Harrisburg, admitted into the intensive care unit, and treated for sepsis.[39]

---

[32]  *Id.* ¶ 31.
[33]  *Id.* ¶ 32.
[34]  *Id.* ¶ 34.
[35]  *Id.*
[36]  *Id.* ¶ 37.
[37]  *Id.* ¶ 38.
[38]  *Id.* ¶¶ 39-40.
[39]  *Id.* ¶¶ 40-41.

After four days of inpatient treatment, including multiple intravenous infusions,

Kenyon was discharged back to the SCI Camp Hill infirmary.[40]

Kenyon recounts that he eventually was discharged from the prison

infirmary at his own request because "he was annoyed by the medical staff['s]

incompetence and did not want to continue being around them."[41]   He does not

state when this self-discharge occurred.

In late September, Kenyon filed an initial grievance regarding his medical

care.[42]  According to Kenyon, the Facility Grievance Coordinator denied the

grievance because it was filed more than 15 business days beyond the date of the

events complained of.[43]  He appealed to the Facility Manager—Acting

Superintendent Gourley—who affirmed the Grievance Coordinator's decision

regarding the untimeliness of the grievance.[44]

Kenyon recalls that his "last surgery for the reversal of the ileostomy" was

scheduled for late September 2022, around the time that he filed his initial

grievance.[45]  This surgery was canceled, and a prison doctor purportedly informed

Kenyon that the operation was canceled by Dr. Mazza because it required a "3 slot

scheduled surgery."[46]  Kenyon, however, avers that his mother contacted Dr.

---

[40]   *Id.* ¶ 41.
[41]   *Id.* ¶ 44.
[42]   *Id.* ¶ 51.
[43]   *Id.*
[44]   *Id.*
[45]   *Id.*
[46]   *Id.*

Mazza's office and was informed by Dr. Mazza's secretary that the surgery had actually been canceled by prison staff without explanation.[47]  Kenyon further claims that, during a subsequent colonoscopy appointment, Dr. Mazza likewise confirmed that this surgery had been canceled by prison staff.[48]  Kenyon avers that, to date, he has never been provided with a reason (in writing) for why prison staff canceled his surgery, although he believes that it was canceled by Gourley in retaliation for filing the late-September grievance.[49]

The ileostomy reversal surgery was eventually performed by Dr. Mazza on December 8, 2022.[50]  Kenyon was discharged from the hospital on December 20, and was then released from the prison infirmary on February 2, 2023, without further complication.[51]

Upon review, it is immediately apparent that Kenyon's comprehensive complaint provides sufficient factual details to state a medical malpractice claim against at least some Defendants.  His allegations, however, do not rise to the level of an Eighth Amendment violation.  The Court will examine the constitutional and state-law claims against each Defendant in turn.

---

[47]  *Id.* ¶ 52.

[48]  *Id.* ¶ 57.

[49]  *Id.* ¶¶ 55-58.

[50]  *Id.* ¶ 61.

[51]  *Id.*

### A.   Eighth Amendment Medical Indifference & Medical Malpractice

In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated."[52]  To state an Eighth Amendment deliberate indifference claim regarding inadequate medical care, a plaintiff must plausibly allege that "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff."[53]  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[54]

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, or denial of reasonable requests for treatment resulting in suffering or risk of injury.[55]  Deliberate indifference to serious medical needs is an exacting standard,

---

[52]   *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[53]   *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023) (citation omitted); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

[54]   *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

[55]   *See Durmer v. O'Carroll*, 991 F.2d 64, 68 & n.11 (3d Cir. 1993) (quoting *Lanzaro*, 834 F.2d at 346).

requiring a showing of "unnecessary and wanton infliction of pain."[56]  Claims

sounding in mere medical negligence will not suffice.[57]

Medical negligence, or medical malpractice, "can broadly be defined as the

unwarranted departure from generally accepted standards of medical practice

resulting in injury to a patient[.]"[58]  To state a medical malpractice claim under

Pennsylvania law, a plaintiff must plausibly allege "a duty owed by the [medical

professional] to the patient, a breach of that duty by the [medical professional], that

the breach was the proximate cause of the harm suffered, and the damages suffered

were a direct result of the harm."[59]  Expert testimony is almost always required to

establish the applicable standard of care, deviation from that standard, causation,

and the resulting harm, because such matters are usually "not within the ordinary

knowledge and experience of laypersons[.]"[60]

There is no doubt that Kenyon has stated a serious medical need.  His Eighth

Amendment medical deliberate indifference claims, however, fail at the second

element.  That is, he has not plausibly alleged facts that would show that any

individual Defendant acted with deliberate indifference toward his serious medical

needs.  The Court will review the allegations against each individual Defendant to

---

[56]   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

[57]   *Rouse*, 182 F.3d at 197.

[58]   *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (citation omitted).

[59]   *Id.* (quoting *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)).

[60]   *Id.* (citing Hightower-Warren, 698 A.2d at 54).

demonstrate why Kenyon's allegations, while at times possibly implicating medical negligence, do not state a constitutional violation.

The Court begins with Dr. Shaikh. This physician is mentioned only a handful of times in the complaint, wherein Kenyon essentially alleges that Dr. Shaikh should have sent him for diagnostic imaging rather than prescribing painkillers for the abdominal pain. It is well settled, however, that mere disagreement as to a medical provider's professional judgment or treatment plan does not rise to the level of a constitutional violation.[61] Kenyon's scant allegations against Dr. Shaikh, which involve being notified of Kenyon's abdominal pain on a single occasion and prescribing a prescription pain reliever,[62] do not suffice to state a claim for medical malpractice, either. Nothing about this single patient-physician interaction evinces treatment that falls below generally accepted standards of medical care.

Kenyon also sues numerous nurses involved in his care. He first alleges that RN Orusede violated his constitutional rights by only providing Tylenol for his

---

[61] *See Lanzaro*, 834 F.2d at 346 (explaining that "mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation"); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) ("Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,' when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." (internal citation omitted)); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

[62] *See* Doc. 1 ¶ 16.

abdominal pain and by failing to inform the on-call doctor of Kenyon's symptoms.[63]  These allegations, while they may implicate medical negligence, do not evince deliberate indifference.  It is clear that Orusede provided treatment to Kenyon upon request; he did not ignore Kenyon, deny requests for treatment, delay treatment, or deny prescribed treatment.  Although Kenyon alleges that Orusede refused to provide more substantial pain medications, he also concedes that Orusede informed him that there was no existing "doctor order" for such prescription medications.[64]  Additionally, Kenyon admits that he was being treated by other nurses at that time, including receiving Toradol from "RN Beigajski."[65]  And Kenyon recounts that Orusede, on his own volition, informed another provider—RN Maduka—about Kenyon's symptoms.[66]  None of these allegations evince deliberate indifference to serious medical needs.

Kenyon next targets RN Maduka.  He claims that, on March 6, Maduka was informed about Kenyon's abdominal pain and Kenyon told her that only Toradol was effective.[67]  Maduka allegedly denied Kenyon's request for Toradol, explaining, like Orusede, that there was no "doctor order" for that prescription medication.[68]  Kenyon then began to yell at Maduka, exclaiming, "If you['re] not

---

[63]   *Id.* ¶¶ 4-5, 8-10.
[64]   *Id.* ¶ 8.
[65]   *Id.*
[66]   *Id.* ¶ 13.
[67]   *Id.* ¶ 12.
[68]   *Id.*

going to [d]o your job, get out of my cell!"[69]  Maduka then allegedly "yelled back"

at Kenyon for yelling at her and left.[70]  She returned several hours later to provide

Kenyon with Tylenol, to which Kenyon responded that he would simply "throw it

up again" and that it "does nothing for abdominal pain."[71]  Maduka informed

Kenyon that she was waiting for a physician to call her back regarding the

appropriate course of treatment.  Several hours later, Kenyon began to have pain in

his pelvic area and Maduka contacted Dr. Shaikh, took Kenyon's vitals, and then

administered a Toradol injection and—several hours later—Tylenol with codeine,

as prescribed by Dr. Shaikh.[72]  Finally, Kenyon asserts that when Maduka ended

her shift, she did not "brief" the "3rd shift" nurse David Werner about his

condition.[73]

These allegations, taken as true, do not implicate medical negligence, let

alone deliberate indifference to serious medical needs.  The time in question

consists of a single work shift, during which Maduka appears to have been

exceedingly attentive to Kenyon's medical needs.  She provided him with several

types of pain medication, visited him on multiple occasions (even after he yelled at

---

[69]  *Id.* ¶ 14.

[70]  *Id.*

[71]  *Id.* ¶ 15.

[72]  *Id.* ¶ 16.

[73]  *Id.* ¶ 18.  In one later paragraph of the complaint, Kenyon alleges that in mid-April he began having abdominal pain and vomiting.  *Id.* ¶ 29.  Kenyon claims that he informed Maduka that he had been "throwing up since last night," and Maduka then left and attempted (unsuccessfully) to locate Dr. Gutierrez.  *Id.*  These allegations, like Kenyon's other allegations involving Maduka, do not evince negligence or deliberate indifference.

her), took his vitals, contacted doctors on his behalf, and comported with those doctors' treatment plans.  There is nothing negligent, much less deliberately indifferent, about Maduka's performance of her nursing duties.

Kenyon also points the finger at RN Effi and RN Kariuki.  He alleges that these "1st shift" nurses are responsible for "wound care/dressing change" and therefore should have flushed or cleaned his PICC line so that it did not become clogged.[74]  He admits however, that there was no order in place for this PICC-line maintenance, and thus Effi and Kariuki were not failing to provide prescribed treatment or denying treatment known to be necessary.[75]  At most, Kenyon's allegations imply that Effi and Kariuki *should have known* that his PICC line needed to cleaned more frequently and failed to meet the proper standard of care for a registered nurse.  Such allegations plainly sound in medical negligence, not deliberate indifference.

Kenyon's allegations against RNS Comer are even more threadbare.  He claims that, after becoming frustrated with the lack of care of his PICC line, he informed Comer about the nurses not cleaning or flushing the line.[76]  She allegedly responded to him that there were no orders in place for this maintenance and the nurses were "doing what they're supposed to do."[77]  This single interaction does

---

[74] *Id.* ¶ 34.
[75] *Id.* ¶ 35.
[76] *Id.* ¶ 35.
[77] *Id.*

not reflect deliberate indifference in any way.  Again, at best, this allegation implies that Comer should have known more about PICC-line maintenance but failed to employ the requisite degree of skill and care ordinarily possessed by a registered nurse supervisor.

Kenyon also sues CHCA Beck for violating his Eighth Amendment rights. He alleges that she "failed to properly supervise her employees," who Kenyon contends provided deficient medical care.[78]  This assertion is the quintessential example of "*respondeat superior*" liability, which does not apply to Section 1983 claims.[79]  Rather, to impose Section 1983 liability, the state actor must have been personally involved in the constitutional misconduct.[80]  Thus, any Eighth Amendment claim against Beck fails.

Kenyon also asserts a medical negligence claim against Beck.[81]  But his single "failure to supervise" allegation does not plausibly plead a standard of care, breach of that standard, proximate causation, or injury for a medical malpractice claim (assuming a "Corrections Health Care Administrator" could be considered a medical professional subject to a professional negligence claim under Pennsylvania law).  Rather, it is a mere legal conclusion that may be disregarded.[82]

---

[78]  *Id.* ¶ 48.
[79]  *See Dooley*, 957 F.3d at 374 (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).
[80]  *Id.*
[81]  *See* Doc. 1 ¶ 81.
[82]  *See Connelly*, 809 F.3d at 787.

Finally, Kenyon asserts both Eighth Amendment and medical negligence claims against Dr. Gutierrez.  Once more, however, his allegations fail to rise to the level of a constitutional violation.

Throughout his complaint, Kenyon recounts the extensive treatment he received from Dr. Gutierrez.  He admits that Dr. Gutierrez provided him with prescription pain medications and injections, promptly responded to his requests for treatment and medical questions, had multiple contact visits with him, frequently sent him to receive outside emergency and surgical treatment (often via ambulance), and even asked Kenyon to directly contact him if he was having additional problems so that Dr. Gutierrez could personally examine him.  None of Kenyon's allegations indicate that Dr. Gutierrez denied treatment known to be medically necessary, failed to respond to reasonable requests for treatment, or delayed treatment for nonmedical reasons.  In no way could Dr. Gutierrez's treatment be considered "unnecessary and wanton infliction of pain."

Rather, Kenyon clearly takes issue with Dr. Gutierrez's professional medical decisions.  For example, he maintains that, instead of treating his abdominal pain with prescription painkillers for several days, Dr. Gutierrez should have sent him offsite for a diagnostic laparoscopy by a gastroenterological specialist.[83]  Kenyon also contends that Dr. Gutierrez improperly managed his PICC line and had to be

---

[83]   *Id.* ¶¶ 5, 48, 51, 71.

informed by another physician (Dr. Mazza) about the proper maintenance of this medical device.[84]  According to Kenyon, Dr. Gutierrez incorrectly believed that because Kenyon was receiving 24-hour infusion through the PICC line, the second port of the line did not require regular flushing.[85]  These types of allegations plainly implicate alleged medical negligence, *i.e.*, that Dr. Gutierrez failed to employ "the degree of knowledge, skill, and care ordinarily possessed by members of the medical profession."[86]  They do not sound in deliberate indifference to serious medical needs.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."[87]

In summary, while Kenyon has plausibly stated a claim for medical negligence against several Defendants, none of his allegations rise to the level of an Eighth Amendment violation.  When a prisoner has received extensive medical treatment and the dispute is over the adequacy of that treatment, courts must be exceedingly hesitant "to second guess medical judgments and to constitutionalize claims which sound in state tort law."[88]  Kenyon is essentially attempting to "constitutionalize" his state-law medical malpractice claims.  But the legal

---

[84]  *Id.* ¶¶ 34-37, 43.
[85]  *Id.* ¶ 35.
[86]  *Toogood*, 824 A.2d at 1150.
[87]  *Pearson*, 850 F.3d at 538 (quoting *Estelle*, 429 U.S. at 106).
[88]  *Id.* (quoting *U.S. ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

standards for constitutional and state-law torts are substantially different, and Kenyon's complaint falls short of alleging a violation of his Eighth Amendment rights. Accordingly, his Eighth Amendment medical indifference claims will be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

### B.   State Action

To the extent that Kenyon is asserting Eighth Amendment medical indifference claims against Dr. Mazza or UPMC West Shore,[89] those claims fail for an additional reason beyond failing to allege deliberate indifference. Only state actors can be subject to Section 1983 liability.[90] UPMC West Shore is a private hospital, and Kenyon has proffered no plausible allegations for why this facility or its employee—Dr. Mazza—should be deemed state actors or why the care he received there could be considered state action.[91] "Action taken by private entities with the mere approval or acquiescence of the State is not state action."[92] Thus, to the extent that Kenyon is asserting Eighth Amendment claims against these private actors, his allegations fail to state a claim for relief.

---

[89] *See, e.g.*, Doc. 1 ¶¶ 84, 85 (noting, under state-law claim for "Medical Negligence," that Defendants "caused the Plaintiff to suffer in violation of his constitutional, statutory and other legal rights," and ending Count 5 by incorrectly stating that this claim is "actionable through 42 U.S.C. § 1983").

[90] *See* 42 U.S.C. § 1983; *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009).

[91] *See Kach*, 589 F.3d at 646.

[92] *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (citation omitted).

C.     "Person" for Section 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by *a person* acting under color of state law."[93]  Only "persons" are subject to suit under Section 1983, and entities such as prisons, medical departments, or private medical companies generally do not qualify as "persons" for purposes of Section 1983.[94]

Under this well-settled law, any Section 1983 claim against defendant Wellpath must be dismissed, as Wellpath is not a person subject to Section 1983 liability.  Moreover, Kenyon does not plausibly allege an unconstitutional policy or custom by Wellpath such that a Section 1983 suit could be maintained against it through its connection with the government.[95]  He asserts only that certain employees of Wellpath (in particular, Dr. Gutierrez and Dr. Shaikh) treated him with Toradol injections, Tylenol, or Tylenol with codeine for his abdominal pain

---

[93]   *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (emphasis added) (citing *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (citing 42 U.S.C. § 1983)).

[94]   *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64-65, 71 (1989); *Slagle v. County of Clarion*, 435 F.3d 262, 264 n.3 (3d Cir. 2006) (affirming on other grounds and observing that district court properly "dismissed Clarion County Jail as a defendant in this case," quoting district court's reasoning that "'it is well established in the Third Circuit that a prison is not a "person" subject to suit under federal civil rights laws'"); *Stankowski v. Farley*, 487 F. Supp. 2d 543, 554 (M.D. Pa. 2007) (finding that PrimeCare is not a "person for purposes of Section 1983" and thus not subject to liability under that statute); *see also Fischer v. Cahill*, 474 F.2d 991, 992 (3d Cir. 1973) (holding that "New Jersey Prison Medical Department" was a state agency and not a "person" under Section 1983).

[95]   *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).

instead of sending him to the hospital for evaluation.[96]  These allegations do not plausibly state an unconstitutional policy or custom by Wellpath; instead, they reflect improper or negligent treatment by certain Wellpath employees.

Moreover, while Kenyon claims that through "additional discovery [he] would likely have evidentiary support that Wellpath [] has official customs, policies, practices, and procedures that result in deliberate indifference towards prisoners['] serious medical needs,"[97] such a general fishing expedition is impermissible without plausible allegations of a constitutional violation.[98] Accordingly, the Eighth Amendment Section 1983 claim against Wellpath will be dismissed pursuant to Section 1915A(b)(1).

### D.    First Amendment Retaliation

Although a prisoner's constitutional rights are necessarily circumscribed, an inmate still retains First Amendment protections when they are "not inconsistent" with prisoner status or with the "legitimate penological objectives of the corrections system."[99]  To state a First Amendment retaliation claim, a plaintiff

---

[96]   Doc. 1 ¶¶ 48, 86.

[97]   *Id.* ¶ 47.

[98]   *See Zuk v. E. Pa. Psychiatric Inst. of Med. Coll. of Pa.*, 103 F.3d 294, 299 (3d Cir. 1996) ("[D]iscovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action."); *see also Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim." (citations omitted)).

[99]   *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

must plausibly plead that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the plaintiff's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.[100]

Kenyon recounts that he lodged a grievance in late September 2022 related to his medical care—the protected First Amendment conduct. He maintains that, shortly after he filed this grievance, his outpatient surgery appointment with Dr. Mazza was canceled by prison officials—the adverse action. Kenyon posits that this cancelation was retaliatory conduct by Acting Superintendent Gourley for filing the grievance. Although there is some question regarding whether Kenyon has plausibly alleged knowledge of the protected conduct and causation,[101] his complaint, liberally construed, alleges sufficient facts to establish each element of a First Amendment retaliation claim.

---

[100] *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser*, 241 F.3d at 333).

[101] Kenyon avers that he filed the grievance in late September, around the time that his surgery appointment was scheduled. Doc. 1 ¶ 51. This appointment was purportedly canceled by prison staff. *Id.* ¶¶ 52, 57. Kenyon appears to allege that Gourley became aware of the grievance because he is the Facility Manager who handled the first-level appeal of the initial denial of this grievance. *See id.* ¶¶ 51, 58. However, there is often a significant amount of time between the initial denial of a grievance, the filing of an appeal by the prisoner, and receipt of that appeal by the Facility Manager (who is usually the superintendent of the prison). Thus, it is unclear from the complaint whether the appointment cancelation occurred before Gourley received Kenyon's appeal and learned of the grievance, or after. In any event, such issues are more properly considered at the summary judgment stage.

### E.   Official Capacity Claims

Kenyon sues all Defendants in their individual and official capacities, even though some Defendants are business entities or private hospitals.[102]  However, any official capacity claim seeking monetary damages from state officials is barred by Eleventh Amendment sovereign immunity.

The Eleventh Amendment to the United States Constitution prevents federal courts from entertaining lawsuits—by United States citizens or citizens of foreign states—brought against a state.[103]  This immunity from private suit extends to state agencies as well as state officials acting in their official capacity, because such lawsuits are essentially civil actions "against the State itself."[104]  States may waive this immunity if they choose, but Pennsylvania has explicitly not waived its immunity with respect to claims brought under Section 1983.[105]  There are two exceptions to the Eleventh Amendment's bar to private suits against nonconsenting states: (1) "Congress may abrogate a state's immunity" and (2) "parties may sue state officers for *prospective* injunctive and declaratory relief."[106]

---

[102]  *See* Doc. 1 at p. 3-7.
[103]  U.S. CONST. amend. XI; *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997); *Hans v. Louisiana*, 134 U.S. 1, 10 (1890).
[104]  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).
[105]  *See* 42 PA. CONS. STAT. § 8521(b); *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 & n.5 (3d Cir. 2010) (citing 42 PA. CONS. STAT. § 8521(b)).
[106]  *Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa.*, 141 F.3d 88, 91 (3d Cir. 1998) (emphasis added) (citing, *inter alia*, *Ex parte Young*, 209 U.S. 123 (1908)).

Kenyon seeks nominal, compensatory, and punitive damages, as well as costs.[107]  To the extent those monetary damages are sought against state officials in their official capacities, such claims are barred by Eleventh Amendment sovereign immunity.  Kenyon also seeks declaratory relief in the form of a declaration that his civil rights were violated,[108] but this is retrospective, rather than prospective, relief.  Moreover, because Kenyon has failed to plausibly allege a constitutional violation against any Defendant other than Gourley (most notably, he has failed to state a constitutional tort claim against non-state agents Dr. Mazza and UPMC West Shore), no official capacity claim survives Section 1915A(a) scrutiny.

## III.   CONCLUSION

Based on the foregoing, the following claims may go forward in this case: (1) an individual-capacity Section 1983 First Amendment retaliation claim against Gourley; and (2) state-law medical malpractice claims against Dr. Gutierrez, RN Orusede, RN Effi, RN Kariuki, RNS Comer, Dr. Mazza, UPMC West Shore, and Wellpath.[109]  An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[107] Doc. 1 ¶¶ 104-09, 111.

[108] *Id.* ¶ 103.

[109] Kenyon appears to be suing UPMC West Shore and Wellpath via a state-law *respondeat superior* theory of liability for the allegedly negligent actions of their employees.